IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Adrian Thomas, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 16 C 4975 |
| | ) |
| Wexford Health Services, | ) |
| Inc. et al., | ) |
| | ) |
| Defendants. | ) |

MEMORANDUM OPINION AND ORDER

Adrian Thomas, previously incarcerated at Stateville Correctional Center, has sued Dr. Alma Martija and Dr. Saleh Obaisi,[1] the doctors who treated him at Stateville, their employer, Wexford Health Sources, Inc., and Randy Pfister, the warden of Stateville. Thomas alleges that Dr. Martija and Dr. Obaisi provided constitutionally inadequate medical care and that they did so pursuant to Wexford's unconstitutional policy or practice. He also alleges that Pfister was deliberately indifferent to his serious medical needs.

Defendants seek summary judgment. They argue that plaintiff is not entitled to a trial because the undisputed evidence does not establish that any individual defendants were deliberately indifferent to Thomas's serious medical needs or that Wexford

---

[1] Dr. Saleh Obaisi is now deceased and substituted in this action by the executor of his estate. Dkt. No. 121.

1

had an unconstitutional policy or practice that caused Thomas harm. These motions are granted in part and denied in part.

I.

The facts are set forth as favorably to Thomas, the non-moving party, as permitted by the record. *See Hanners v. Trent,* 674 F.3d 683, 691 (7th Cir. 2012).

A. Thomas's Medical History

In October 2014, Thomas complained to Dr. Martija about nasal issues, she diagnosed him with sinusitis, and she prescribed antibiotics. In a December 2014 appointment, Dr. Martija noted that Thomas' sinusitis had been resolved. In February 2015, Dr. Obaisi saw Thomas regarding his renewed complaints about his nose. Dr. Obaisi noted that Thomas had severe nasal septum deviation, sinusitis, and bronchitis. He prescribed medication. On June 30, 2015, Dr. Obaisi recommended that Thomas see a specialist at the University of Illinois at Chicago ("UIC") about these conditions. In October 2015, Thomas was taken to UIC to see Dr. Stephanie Joe, an otolaryngologist, who noted Thomas was experiencing "[s]ome facial pressure and pain under eyes" and diagnosed Thomas with a deviated septum and hypertrophic nasal turbinates. Dkt. No. 107-1 at 15–16. Dr. Joe recommended elective nasal surgery to address this condition, which Thomas agreed to. Dr. Obaisi prepared the surgery clearance forms. Thomas returned to UIC on November 30, 2015 and

2

underwent nasal surgery from Dr. Joe. He left surgery with a splint and sutures in his nose. Dr. Joe's written surgical discharge instructions were that Thomas return for a follow-up in three weeks. The next day, Dr. Obaisi signed Dr. Joe's consultation form from the surgery, which noted Thomas's splints, but did not mention a follow-up visit as part of her recommendations and plans.

On January 12, 2016, Thomas spoke with a physician's assistant at Stateville about returning to UIC for his follow-up appointment. The physician's assistant told Thomas that she would speak with Dr. Obaisi. Thomas sent Stateville medical staff multiple request slips seeking an appointment but these requests "went unanswered." Dkt. No. 107-4, Thomas Dep. at 32:14-33:7.

Thomas saw Dr. Obaisi on March 5, 2016 and spoke to him about returning to UIC. Thomas testified that Dr. Obaisi refused and stated, "he was the medical doctor and he would send [the plaintiff] out whenever he got ready." Dkt. No. 107-4, Thomas Dep. at 16:15-17:4. Thomas also testified that Dr. Obaisi and Dr. Martija told him that Wexford was on a budget and they were trying to save Wexford money.

On March 29, 2016, Dr. Obaisi made a referral for Thomas to see Dr. Joe. However, in a collegial review by Wexford, the decision was made to evaluate Thomas at Stateville and then

3

discuss again whether a follow-up at UIC was medically necessary. On either April 1st or April 7th, Dr. Obaisi attempted to remove a suture remaining from Thomas's surgery, which, Thomas contends, caused a splint to break and created a perforation in his nose. Wexford approved Thomas for a follow-up appointment with Dr. Joe on April 13, 2016. Thomas saw Dr. Joe the next day. She found that Thomas had a pinhole sized perforation in his nose, which was one of the potential risks of the surgery. Dr. Joe made no determination as to whether that perforation was caused by Dr. Obaisi's attempt to remove the suture. But she did testify that it would "potentially" be painful for Thomas if the splints were left in for more than three weeks. Dkt. No. 107-1, Dr. Joe Dep. at 19:13-18.

B. Thomas's Complaints and Grievances

On January 18, 2015 Thomas filed a grievance in which he complained that Wexford, Dr. Obaisi, and Dr. Martija had unnecessarily delayed his treatment, causing his condition to worsen. On January 26th, Thomas spoke with Pfister in the Stateville commissary and explained that he was having trouble breathing and was supposed to be sent back to UIC for a follow-up appointment. Pfister responded "[m]an it looks like you're standing here fine breathing to me. File an emergency grievance." Pfister had a practice of taking notes from conversations with inmates and generally followed up on these

4

notes by meeting with department supervisors. Thomas understood emergency grievances are sent "straight to the warden." Dkt. No. 99-3, Thomas Dep. at 43:2-7. He submitted an emergency grievance on January 28th, in which he stated that he had nose surgery in November 2015, and he was supposed to have the splints removed a few weeks later. He complained the splints and stitches were causing difficulty breathing, swelling, and shooting pains and requested to return to UIC for an appointment to have the splints removed. Pfister's designee determined it was not an emergency and checked the box that the grievance be submitted through regular channels.

The grievance officer's recommendations in response to Thomas's grievances include "[n]o action as grievant appears to be receiving appropriate medical care at this time" and "[a]fter reviewing offender's medical record, the offender has been seen several times." Dkt. No. 123, Resp. to Plaintiff's LR56.1 Statement of Additional Facts at ¶ 26. These recommendations were signed by a designee of Pfister in his name. *Id*.; Dkt. No. 99-4, Pfister Dep. at 60:9-60:16.

On March 23, 2016 Thomas submitted an emergency grievance in which he again complained that he was supposed to return to UIC a few weeks after his November 2015 surgery, but was still waiting, in pain, to have his splints removed. Pfister's designee determined it was not an emergency and checked the box

that the grievance be submitted through regular channels. On April 7, 2016 Thomas submitted another emergency grievance stating that he was supposed to be sent to UIC but Dr. Obaisi instead attempted to remove his stitches, causing unnecessary pain. Thomas then filed this lawsuit in May 2016.

II.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bears the initial responsibility of informing the district court of the basis for its motion . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To avoid summary judgment, the non-moving party must then "present specific facts showing that there is a genuine issue for trial; inferences that rely upon speculation or conjecture are insufficient." *Aguilar v. Gaston-Camara*, 861 F.3d 626, 630–31 (7th Cir. 2017) (quotations and citations omitted).

The Eighth Amendment protects prisoners from conditions of confinement that "involve the wanton and unnecessary infliction of pain[.]" *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). This protection extends to the denial of medical care, which can result in pain without any penological purpose. *Estelle v. Gamble*, 429 U.S. 97, 103-104 (1976). To establish a violation of this right, a plaintiff "must prove that he suffered from '(1)

6

an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)).

Thomas bears a heavy burden of proof to demonstrate that prison officials acted with a "sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). He need not establish that the officials intended to harm him, rather "it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Id*. Mere negligence or gross negligence by defendants, however, will not suffice. *King v. Kramer,* 680 F.3d 1013, 1018 (7th Cir. 2012). A prison medical professional's treatment decision does not raise an inference of deliberate indifference unless the "decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Gayton v. McCoy*, 593 F.3d 610, 622–23 (7th Cir. 2010) (citation omitted). "[E]ven if a doctor denies knowing that he was exposing a plaintiff to a substantial risk of serious harm, evidence from which a reasonable jury could infer a doctor knew he was providing deficient treatment

7

is sufficient to survive summary judgment." *Petties v. Carter*, 836 F.3d 722, 726 (7th Cir. 2016), *as amended* (Aug. 25, 2016).

III.

There is no dispute over the first element of Thomas's claim—that he suffered from an objectively serious medical condition. The parties dispute whether Thomas has raised a genuine issue of material fact as to the second element of this claim—that state officials were deliberately indifferent to his serious medical needs. I must look at each defendants' knowledge and actions to determine whether a reasonable jury could find that any of them had the requisite culpable state of mind. *Gayton*, 593 F.3d at 621.

A. Dr. Martija

Thomas contends that he has raised an issue of material fact as to whether Dr. Martija was deliberately indifferent to his medical needs by "refusing to timely comply" with Dr. Joe's request for a follow-up appointment with Thomas three weeks after his surgery. Dkt. No. 118, Resp. Br. at 4. However, the record contains no evidence that Dr. Martija was personally involved in, or otherwise knew of, Thomas's 2015 surgery or his post-operative care. *See Harper v. Albert*, 400 F.3d 1052, 1062 (7th Cir. 2005) ("[I]n order for liability to attach under § 1983, an individual must have personally caused or participated in the alleged constitutional deprivation.") (citation and

internal quotation marks omitted). Nor do the two visits Thomas paid to Dr. Martija in 2014 raise a reasonable inference that Dr. Martija knew Thomas had a deviated septum or enlarged nasal turbinates, delayed surgery for such conditions, or otherwise disregarded a risk to Thomas's health. Dr. Martija first diagnosed Thomas with sinusitis and immediately prescribed medication to treat it. She observed that Thomas's sinusitis had been resolved at his second visit. Accordingly, defendants' motion is granted with respect to Dr. Martija.

## B. Dr. Obaisi

Thomas contends that Dr. Obaisi was deliberately indifferent to his medical needs by causing an unnecessary nine-month delay in securing surgery to remedy Thomas's deviated septum and enlarged turbinates and six-month delay in Thomas's post-surgery follow-up appointment with Dr. Joe. Thomas also argues that the latter delay contravened Dr. Joe's directive that Thomas see her for a follow-up three weeks after surgery, and Dr. Obaisi's attempt at remove the suture from Thomas's nose himself caused a perforation. Dr. Obaisi responds that there is no evidence he received Dr. Joe's directive but rather the record, as a whole, shows that Thomas received timely care both before and after his surgery. Dr. Obaisi also argues that there is no evidence his suture removal attempt amounted to deliberate indifference rather than mere negligence.

9

Thomas is correct that "an inexplicable delay in treatment which serves no penological interest" can support an inference of deliberate indifference. *Petties*, 836 F.3d at 730 (citation omitted). However, to raise an issue that a delay of medical treatment caused him harm, Thomas must offer "verifying medical evidence that the delay (rather than [his] underlying condition) caused some degree of harm." *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (citation omitted). Thomas has assembled medical evidence to support his testimony that treatment delays caused him unnecessary pain. Dr. Joe testified that the delay in Thomas's follow-up appointment had the potential to cause him additional pain. Likewise, medical records note that Thomas experienced facial pain and had severe septal deviation and enlarged nasal turbinates. *See, e.g., Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) ("[M]edical records indicating that [plaintiff] had a nasal fracture, that he could experience further bleeding, and that he may need to see a specialist . . . . would certainly help a jury determine whether the delay unnecessarily prolonged and exacerbated [plaintiff's] pain") (internal quotations and citation omitted).

Thomas's claim is not doomed if he does not show Dr. Obaisi was informed of Dr. Joe's directive for a follow-up three weeks after surgery. Dr. Obaisi approved the initial surgery and signed Dr. Joe's consultation note upon his return to Stateville

which indicated he had splints in his nose from that surgery. Thomas sought to see Dr. Obaisi by contacting a Stateville physician's assistant in January 2015, who said she would relay the request to Dr. Obaisi. Thomas also testified that he filed multiple requests for an appointment. Dr. Obaisi did not see Thomas regarding his surgery until March 5, 2016, when Thomas asked to be sent to UIC to have his splints and stitches removed. Even then, Dr. Obaisi did not request a follow-up appointment at UIC until March 29th, some 24 days later. These delays are sufficient to support an inference of deliberate indifference. *See id*. (one-and-a-half-day delay in treatment of broken nose by guards who knew inmate was in pain created a genuine issue of fact as to their states of mind).

That said, Thomas has not provided medical evidence to support his contention that Dr. Obaisi caused the perforation in his nose. Dr. Joe had no opinion as to whether the delay in Thomas's treatment caused any of his medical conditions. Nor is Thomas qualified to opine on medical causation himself. *See Goffman v. Gross*, 59 F.3d 668, 672 (7th Cir. 1995) (explaining "inmates' lay testimony by itself cannot establish the showing of medical causation necessary to sustain" a deliberate indifference claim).

Accordingly, defendants' motion is granted only as to the extent it seeks to hold Dr. Obaisi liable for a nasal

perforation, and otherwise may proceed as to Thomas's claim of unnecessary delay.

## C. Wexford

Thomas contends that Wexford had a policy and practice of delaying treatment for prisoners. While Wexford is a private entity, "the *Monell* theory of municipal liability applies in § 1983 claims brought against private companies that act under color of state law." *Whiting,* 839 F.3d at 664 (citations omitted). To hold Wexford "liable under § 1983 and *Monell*, [Thomas] must demonstrate that the defendants' official policy, widespread custom, or action by an official with policy-making authority was the moving force behind his constitutional injury." *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016) (internal quotations and citations omitted).

In support, Thomas points to a consent decree filed in *Lippert v. Baldwin et al.*, No. 10-cv-4603 (N.D. Ill. filed January 3, 2019), which, Thomas contends, evidences Wexford's practice of delaying treatment for prisoners. However, Wexford is not a party to this consent decree, which is an agreement between the State of Illinois and a class of plaintiffs. The consent decree also provides that the defendants deny "all Plaintiffs' allegations in this case and maintain the medical and dental care provided to the Plaintiff class is constitutionally adequate." Dkt. No. 119-1 at 86.

12

Thomas also argues that delays in his medical treatment were due to Wexford physicians' decisions to avoid or reduce expenses. Treatment decisions based on administrative concerns can violate the Eighth Amendment when a physician's decision "constituted a failure to exercise medical—as opposed to administrative—judgment. . . ." *Roe v. Elyea*, 631 F.3d 843, 863, n. 17 (7th Cir. 2011). At his deposition, Thomas testified:

> Q. And you talk about Wexford not having a budget enough to correct the treatment delays. Where did you get that information from about the budget?
>
> A. Well, on several occasions, Dr. Obaisi had stated that, that they was on a budget, they were trying to save Wexford money, Martija and several other administrative personnel that worked in the medical field.
>
> Q. What exactly, if anything, specifically do you remember Dr. Obaisi saying to you about that?
>
> A. I just said that, that he was talking about the expenses, the training, the staff.
>
> Q. Did he tell you that's why you weren't sent to UIC?
>
> A. He was talking about the money part and expenses.

Dkt. No. 107-4 at 88:7-24. However, Thomas's testimony about what Dr. Obaisi said[2] is too vague and nonresponsive to raise a

---

[2] To the extent Wexford argues these statements of Dr. Obaisi, who is deceased, are inadmissible and "supported only by the Plaintiff's self-serving testimony," Dkt. No. 125, Resp. Br. at 11, the Dead Man's Act does not apply in cases alleging constitutional violations pursuant to 42 U.S.C. § 1983. *Plakas v. Drinski*, 811 F. Supp. 1356, 1358 n. 1 (N.D. Ind. 1993) (citing Fed. R. Evid. 601).

13

reasonable inference that Dr. Obaisi, in deciding to delay Thomas's treatment, supplanted his medical judgment with Wexford's budgetary directive, policy, or widespread custom. Summary judgment is granted to Wexford.

### D. Pfister

Thomas argues that his January 2016 conversation and emergency grievances put Pfister on notice that he was suffering from unnecessary delays in his medical care. Pfister responds that Thomas has not collected evidence that he had actual subjective knowledge of a serious risk to Thomas's health or that he was personally involved in Thomas's alleged constitutional deprivation. Pfister also argues that he was entitled to defer to the expertise of medical professionals and that Thomas's claim for injunctive relief against him is moot because Thomas is no longer an inmate at Stateville.

Thomas has marshalled enough evidence to allow a jury to reasonably infer Pfister had actual knowledge that Thomas's medical care was unnecessarily delayed and took no action. Thomas testified that he told Pfister in January 2016 that he was having trouble breathing and was supposed to be sent back to UIC for a follow-up appointment.[3] According to Thomas, Pfister

---

[3] Pfister objects that is this inadmissible hearsay. It is not. Fed. R. Evid. 801(d)(2) (A statement that is "offered against an opposing party" and "was made by the party in an individual or representative capacity" is not hearsay.)

14

directed him to file an emergency grievance, which he did. Pfister also filed subsequent emergency grievances asking to be sent for his follow-up at UIC and complaining of ongoing delays in his medical care. While Pfister may not recall this conversation or Thomas's specific grievances, he had responsibility over the emergency grievances Thomas filed. *See* Ill. Admin. Code tit. 20, § 504.840. ("An offender may request a grievance be handled on an emergency basis by forwarding the grievance directly to the Chief Administrative Officer."). Pfister claims he never saw these emergency grievances but admits the report on Thomas's grievance was signed by his "designee that had signature authorization." *See* Dkt. No. 99-4, Pfister Dep. at 60:3-61:13. He also admits he had a practice of taking notes from conversations with inmates and generally followed up on those notes with department supervisors, but he offers no evidence he did so with Thomas's complaint. Given Pfister's individual failure to act on his conversation with Thomas, the emergency grievance he directed Thomas to file, Thomas's subsequent emergency grievances, and Pfister's responsibility over those grievances, Thomas has raised an issue of fact as to whether Pfister knew about unconstitutional delays in his medical care and nonetheless turned "a blind eye[.]" *See Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (citations omitted); *see also Arnett v. Webster*, 658 F.3d

742, 755 (7th Cir. 2011) ("Non-medical defendants cannot simply ignore an inmate's plight" where they have reason to believe prison medical staff is not treating a prisoner) (citations omitted).

Further, in light of this evidence, Pfister cannot wholly insulate himself from personal involvement in Thomas's alleged constitutional deprivation by delegating "much of the review of medical grievances to administrative assistants" and claiming he was not put on notice by the emergency grievances sent to his office. *Flournoy v. Ghosh*, 881 F. Supp. 2d 980, 992 (N.D. Ill. 2012); *see also Martinez v. Garcia*, No. 08 C 2601, 2012 WL 266352, at *2 (N.D. Ill. Jan. 30, 2012) (explaining "no individual may routinely perform the Warden's duties, [although] a Warden may designate another person to perform his or her duties 'during periods of his or her temporary absence or in an emergency.'") (citing 20 Ill. Admin. Code § 504.805(b)).

Pfister also argues that he relied on the judgment of medical staff treating Thomas. True, "in determining the best way to handle an inmate's medical needs, prison officials who are not medical professionals are entitled to rely on the opinions of medical professionals." *Lee v. Young*, 533 F.3d 505, 511 (7th Cir. 2008) (citation omitted). However, the record is bereft of evidence that Pfister relied on the judgment of medical professionals. There is no evidence in the record that

16

Pfister, or any of his subordinates, conferred with medical staff. Rather the grievance reports indicate that an IDOC grievance officer reviewed Thomas's medical files at determined that he was receiving adequate medical care. The record is silent on that grievance officer's medical qualifications.

Nor is there evidence that these grievance reports addressed the delays Thomas complained of beyond the unadorned conclusion he was receiving some treatment. As Thomas correctly points out: Pfister is not entitled to summary judgment for his reliance on these "unresponsive" grievance reports. *See Martinez*, 2012 WL 266352, at \*6 ("[Warden's] failure to take action despite receiving both a letter and an in-person communication in which [inmate] informed him of the medical staff's refusal to treat him, coupled with [prison doctor's] unresponsive memos, suffices to defeat summary judgment.").

Lastly, Thomas's request for injunctive relief against Pfister is moot. The undisputed record shows Thomas is currently an inmate at Menard Correctional Center where Pfister is not the warden. Accordingly, Pfister's motion is granted, in part, with respect to Thomas's claim for injunctive relief and is otherwise denied.

IV.

For the foregoing reasons, defendants' motions are granted with respect to Dr. Martija, the claim that Dr. Obaisi

17

perforated Thomas's nose, Wexford, and the injunctive claim against Pfister and denied with respect to the remaining claims against Dr. Obaisi and Pfister.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: October 9, 2019